UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 22-cr-223(10) (NEB/DTS)

UNITED STATES OF AMERICA,

Plaintiff,

v.

**ORDER OF DETENTION**

ABDINASIR ABSHIR,

Defendant,

On February 28, 2025, Abdinasir Abshir ("Defendant") appeared before the Court for a hearing on the government's motion for revocation of pretrial release following his arrest. Defendant was represented by Craig Cascarano. Assistant United States Attorney Joseph H. Thompson represented the United States. Based on the findings of fact and conclusions of law set forth below, the government's motion to revoke Defendant's pretrial release is GRANTED.

**FINDINGS OF FACT**

1.      Defendant and his co-defendants are charged with orchestrating and carrying out a scheme to defraud the Federal Child Nutrition Program ("Program") out of about $250 million. In particular, Defendant is charged with having opened a fraudulent food-distribution site, within the Program and under the sponsorship of Feeding Our Future. Defendant, and his charged co-conspirator and brother, Asad Abshir, called that site Stigma Free Mankato. Defendant is charged with having falsely claimed, between November 2020 and November 2021, to have served an astounding number of meals, more than 1.6 million, at the Stigma-Free Mankato site.

Based on these claims, they allegedly received approximately $5 million in Program funds. For that alleged conduct, Defendant stands charged of wire fraud conspiracy, wire fraud, conspiracy to commit federal programs bribery, federal programs bribery, money laundering conspiracy, and money laundering.

2.      On February 10, 2025, trial commenced against Aimee Bock and Salim Said—two of the defendant's charged co-conspirators. Defendant and other defendants named in the same indictment are scheduled to be tried at later dates.

3.      On February 18, 2025, the government presented testimony from Postal Inspector John Western. During the morning session, Inspector Western testified about the Stigma Free Willmar site. Just prior to the lunch break, the government explained that Inspector Western would testify after lunch about the Stigma Free Mankato site—the site run by Defendant. The government informed defense counsel that Inspector Western's testimony would likely last another hour, after which the government planned to call a cooperating defendant.[1]

4.      After the lunch break, Defendant and another man entered the courtroom loudly. Based on the timing of Defendant's arrival in court, it appeared as though someone had informed him of the testimony related to his fraudulent food site. Although the gallery was not crowded, they sat in the front row on the far side of the courtroom closest to the jury box. After sitting down, Defendant and the other

---

[1] The government had previously informed defense counsel of the name of the cooperating defendant scheduled to testify.

man were disruptive and noisy. At one point, a court security officer appeared to ask one of the men to leave. Both men then left the courtroom.

5.      During the afternoon break, the attorney representing the cooperating defendant informed the government that one of the two men—later determined to be Defendant—had approached his client in the hallway. The cooperating defendant had been sitting on the bench immediately outside the courtroom, waiting to testify. Defendant approached the cooperating defendant.

6.      According to the cooperating defendant's later description of the events, the cooperating defendant recognized Defendant from their prior interactions in the course of the charged fraud scheme, but he could not recall Defendant's name. The cooperating defendant assumed—incorrectly—that Defendant was also waiting to testify as a trial witness. The cooperating defendant told Defendant that he was testifying. Defendant then asked the cooperating defendant to step into the bathroom with him so they could talk. The cooperating defendant felt intimidated and understood that Defendant was trying to intimidate him. The cooperating defendant declined to enter the bathroom and returned to the witness room with his lawyer. Later that day, the cooperating defendant confirmed that a photograph of Defendant pictured the man who had approached him and tried to intimidate him.

7.      The same day that Defendant came to the courthouse and attempted to intimidate a cooperating witness, Defendant was scheduled to meet—in the same building—with his pretrial release supervisor. He failed to appear for that mandatory meeting.

3

8.     After these events, the government sought to determine Defendant's whereabouts. Law enforcement agents went to the apartment that Defendant had identified as his residence to his pretrial release supervisor. The residents of that apartment informed law enforcement that they had recently moved in and that Defendant was not living there.

9.     In the investigation that followed, law enforcement determined that soon after the events on February 18, Defendant ostensibly abandoned his cell phone and began using, instead, a friend's phone. He used that friend's phone when he eventually reestablished contact with his pretrial release supervisor.

10.     On the basis of these and other facts, the government moved pursuant to 18 U.S.C. § 3148(a) to revoke Defendant's pretrial release. The Court held a hearing on that motion on February 28, 2025.

11.     The government argued that Defendant posed a risk of non-appearance and a danger to the community.

12.     Defendant consulted with his counsel prior to the detention hearing and was represented by counsel at the hearing. Defendant contested the government's motion for detention and sought release.

13.     The government argued that Defendant had violated the mandatory terms of his pretrial release, including by speaking with a witness in a related case, by misrepresenting to his pretrial release supervisor where he was residing, and committing a crime—namely attempted intimidation of a witness. Such conduct, the government argued, made clear that Defendant was determined to violate his release

terms and the law and accordingly no combination of conditions short of detention could reasonably assure community safety or his future appearance.

14.    Defendant argued that release to a halfway house and/or with electronic monitoring would suffice.

## DISCUSSION

The appropriate analysis for deciding the issue of revocation of pretrial release upon the appearance before a judicial officer of a person charged with an offense is governed by18 U.S.C. § 3148. Under that statute, the Court "shall enter an order of revocation and detention if, after a hearing, the judicial officer finds . . ." either "probable cause to believe that the person has committed a Federal, State, or local crime while on release"; or "clear and convincing evidence that the person has violated any other condition of release"; and either:

(1)    ". . . there is no condition or combination of conditions of release that will assure the person will not flee or pose a danger to the safety of any other person or the community;" or

(2)    "the person is unlikely to abide by any condition or combination of conditions of release."

18 U.S.C. § 3148. Furthermore, if there is probable cause that the defendant committed a felony offense, "a rebuttable presumption arises that no condition or combination of conditions will assure that the person will not pose a danger to the safety of any other person or the community." *Id.*

Based on the proffers made and arguments presented at the hearing, the Court finds there is probable cause to believe Defendant has committed a felony offense while on release by attempting to intimidate a government witness and cooperator

inside the courthouse shortly before that cooperator's testimony was scheduled to begin. The Court further finds there is clear and convincing evidence that Defendant's conduct also violated the conditions of his release, which expressly ordered that he "avoid all contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution, including co-defendants/co-conspirators under this and all related cases." Dkt. #67 ¶7(g).

The Court next addresses the issue of Defendant's detention. The place and timing of the alleged witness intimidation are notable, occurring mere feet from the sitting federal judge as she presided over the trial of his co-defendants, and just before the witness was about to testify.

Like the jury tampering that has been alleged to have occurred in the only other Feeding Our Future case tried thus far, intimidation of a witness is also a direct attack on the integrity, efficacy, and reliability of this nation's judicial system. The disregard for norms of laws and rules is all the more brazen in the context of the heightened scrutiny after the jury tampering charges stemming from the previously tried case.

The Federal Rules of Criminal Procedure were amended, in part, to address the concerns for jury tampering and witness intimidation in the so-called New York mafia trials that seemed from a distant place and a vestige of a long by-gone era. The allegations of jury tampering and witness intimidation in the Feeding Our Future cases, however, affirm that the concerns giving rise to the amended criminal procedures remain real here today.

Based on Defendant's alleged attempt to tamper with and intimidate a cooperating defendant witness; Defendant's new criminal charges; Defendant's misrepresentation of his residence to his pretrial release supervisor; Defendant's demonstrated unlikelihood of abiding by any condition or combination of conditions of release that this Court could fashion; and the record before the Court, no condition or combination of conditions would reasonably address the issue of public safety or the reappearance of Defendant. *See* 18 U.S.C. § 3148(b)(2)(A) and (B).

Accordingly, IT IS HEREBY ORDERED that:

1. The motion of the United States for revocation of the pretrial release of Abdinasir Abshir is granted;

2. Mr. Abshir is committed to the custody of the United States Marshal;

3. Mr. Abshir shall be afforded reasonable opportunity to consult privately with his lawyer; and

4. Upon Order of the Court or request by the United States Attorney, the person in charge of the corrections facility in which Mr. Abshir is confined shall deliver him to the United States Marshal for the purpose of appearance in connection with a Court proceeding.

Dated: <u>March 5, 2025</u>          <u>*s/ Tony N. Leung*</u>
                                     The Honorable Tony N. Leung
                                     United States Magistrate Judge